Jasbir K. KASURI, Plaintiff–Appellant (89–3041), Cross–Appellee (89–3086), Plaintiff–Appellee (89–3224),

v.

ST. ELIZABETH HOSPITAL MEDICAL CENTER; William Johnson, Dr.; Charles E. Wilkins, Dr., Defendants–Appellees (89–3041), Cross–Appellants (89–3086), Defendants–Appellants (89–3224).

Nos. 89–3041, 89–3086 and 89–3224.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 1, 1989.

Decided Jan. 2, 1990.

Ira J. Mirkin (argued) and Barry Laine, Green, Haines, Sgambati, Murphy & Macala, Youngstown, Ohio, for Jasbir K. Kasuri.

Ned C. Gold, Jr. (argued), Hoppe, Frey, Hewitt & Milligan, Warren, Ohio, for St. Elizabeth Hosp. Medical Center, Dr. William Johnson, and Dr. Charles E. Wilkins.

Before MILBURN and GUY, Circuit Judges, and LIVELY, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

Plaintiff, Dr. Jasbir K. Kasuri, appeals from this judgment in an employment discrimination case in favor of the defendant St. Elizabeth Hospital Medical Center. Plaintiff raises the following issues on appeal: (1) whether the trial court erred in dismissing the plaintiff's Title VII claim for discrimination based on national origin; (2) whether the district court erred in directing a verdict in the defendant's favor on the plaintiff's state law fraud claim; (3) whether the district court correctly instructed the jury that an essential element of promissory estoppel is a "clear and unambiguous promise"; (4) whether the district court properly allowed the introduction into evidence of certain deposition testimony; and (5) whether the court erred in granting a directed verdict dismissing the claim

against the individual defendants. The defendants cross-appeal for attorney's fees based upon 42 U.S.C. § 2000e–5(k) and Fed. R.Civ.P. 37(c). We affirm.

## I. FACTS

The plaintiff in this action was born in India, where she received her medical education. She emigrated to this country, and she took and passed the Education Commission for Foreign Medical Graduates examination, which is a prerequisite to obtaining a residency. In order to obtain a license to practice medicine in the United States, Dr. Kasuri was required to complete a residency. In 1983, the plaintiff applied to several residency programs, including the Internal Medicine Residency Program at defendant St. Elizabeth Hospital Medical Center (St. Elizabeth).

Dr. Kasuri also served as an extern at St. Elizabeth. The hospital did not compensate Dr. Kasuri for her services, but she was able to further her education by performing rotations under the supervision of a physician. The program was designed to enhance the skills and education of physicians attempting to obtain residency positions, particularly foreign medical graduates. The plaintiff remained as an extern from July 1984 until January 1985, when St. Elizabeth discontinued the program altogether.

The majority of positions in residency programs are filled through a National Resident Matching Program, which assists in matching applicants with programs. Applicants list the programs they prefer, and the programs list their preferences for applicants. Left over positions are filled by the many applicants who remain available after the match list comes out each year. Ultimately, however, the actual selection of residents is a value judgment that is made by the program director at each individual hospital. St. Elizabeth participates in the National Resident Matching Program, although it is unable to fill all of its positions through the match.

After Dr. Kasuri was first denied entry into St. Elizabeth's residency program in 1984, she continued to work as an extern until the externship program was terminated. Later, she served as a research assistant to Dr. Wilkins, who was the program director at St. Elizabeth. Dr. Kasuri claims that she was promised a residency position on various occasions, contingent on her continued service as a research assistant. Dr. Wilkins and his successor, Dr. Johnson, deny making any such promises. They acknowledge encouraging Dr. Kasuri's efforts to obtain a residency position at St. Elizabeth and elsewhere, and they assert that they retained her as a research assistant to provide her with enhanced education and training.

Dr. Kasuri applied for and was denied admission into the residency program at St. Elizabeth in 1985, 1986, and 1987. She asserts that she was told by the hospital that the residency program would only take one Indian at a time. Dr. Wilkins and Dr. Johnson deny making these statements, and they deny the existence of such a policy. As a matter of fact, the internal medicine program at St. Elizabeth has only had one Indian per program year with the exception of one year, when the program had two Indian nationals. After allegedly being told of this policy, Dr. Kasuri filed charges with the Equal Employment Opportunity Commission and with the Ohio Civil Rights Commission.

Dr. Kasuri repeatedly applied to several residency programs at many hospitals, and she was finally admitted to a program at St. Peter's Medical Center in New Brunswick, New Jersey, which she began in July 1988. Dr. Wilkins recommended her to Dr. Hahn, the program director at St. Peter's.

This action was commenced by the plaintiff in 1987. She asserted a Title VII claim against St. Elizabeth for discrimination based upon national origin pursuant to 42 U.S.C. § 2000e, *et seq.* In addition, she asserted causes of action under Ohio law for fraud and promissory estoppel, naming St. Elizabeth, Dr. Johnson, and Dr. Wilkins as defendants. St. Elizabeth made a motion for a directed verdict on the Title VII claim, which was denied. At the close of all evidence, however, the judge issued an oral ruling in favor of the defendant. The

court granted the defendants' motion for a directed verdict dismissing the fraud claim, and the promissory estoppel claim went to the jury. The individual defendants were dismissed from the case pursuant to a directed verdict, and the jury returned a verdict in favor of the defendant St. Elizabeth.

## II. PLAINTIFF'S APPEAL

The plaintiff raises several issues on appeal, and the defendant cross-appeals. We will address these issues *seriatim*, beginning with the plaintiff's allegations of error.

### A. The Title VII Claim

Dr. Kasuri urges the court to reverse the dismissal of the Title VII claim or to remand the claim with instructions to the court to enter findings that reflect the three-part analysis under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

We must review the district court's decision with great deference and may only reverse if we find clear error. *Reynolds v. Humko Prods.*, 756 F.2d 469 (6th Cir.1985). We may remand the case only if we determine that the district judge did not "find the facts specially and state separately its conclusions of law thereon ..." as required by Fed.R.Civ.P. 52(a).

Dr. Kasuri contends that the court erred in not expressing its factual findings in terms of the analysis set forth in *McDonnell Douglas* and as refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This analysis proceeds in three parts, and was expressed by the Supreme Court in *Burdine* as follows:

> In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093 (citations and footnotes omitted). The district court did not issue its findings in the form of the analysis set forth above. Instead, the court found that no discriminatory policy existed at St. Elizabeth, and that there was not sufficient credible evidence of a Title VII violation. The court weighed the testimonial and other evidence, and also considered collateral evidence related to the regional economy around St. Elizabeth:

> THE COURT: The Court will announce its decision and will constitute the court's findings of fact and conclusions of law....
>
> ....
>
> The Court finds that the position of resident within the hospital is a position which is subject to the protection of Title VII. The claim that is advanced in support of the discrimination is one based upon national origin. The Court finds that the plaintiff is from the country of India, and as a consequence her national origin relates to the country of India even though she's now an American citizen.
>
> The question that develops is whether or not the plaintiff has established by a preponderance of the evidence that the defendant hospital had a policy, either written or otherwise, to the effect that it would only allow, no matter how many good applicants there were whose national origin was the country of India, they would only accept one person with the national origin of India into their program on an annual basis.
>
> The Court finds that there are a number of facts that need to be taken into consideration other than the sworn testimony of the plaintiff to the effect that

she was told repeatedly that the allotment for the country of India has been satisfied for a given year, and therefore, her application was being rejected, and of course, the contrary evidence from Dr. Johnson was that there is no such policy, nor was any statement ever made.

. . . .

The Court finds that the doctors who are either foreign born or foreign educated are constantly seeking residency positions in teaching hospitals throughout the hospital and the defendant hospital is no exception, and the defendant hospital is allowed to accept twelve such residents on an annual basis with the year beginning as of July 1st of any given year.

The Court finds that the national average of foreign students that are allowed into residency programs throughout the medical schools in the United States is approximately 18 percent. The Court contrasts that 18 percent figure with what the evidence demonstrates with respect to the defendant hospital and finds that in the years in question, that is from July 1, '84 through July 1, '87 which as the Court takes into consideration is four separate years.

. . . .

The number of persons with Hispanic background number twelve, the number of people with Oriental background number seven, the number from India represent five, blacks from the United States represent three. There are two from Lebanon, one from Romania, three from Egypt, one from Italy, demonstrating a vast panorama of nationalities, races and medical school backgrounds.

The court suspects that St. Elizabeth Hospital Medical Center may well have more difficulty than some areas in attracting students into its residency program for the reason that Mahoning county [and] Youngstown in particular, have been depressed areas now for [a] substantial period of time....

That may account for the substantial number of foreign residents at the defendant hospital. But in any event, there is an extraordinary number of foreign residents at St. Elizabeth Hospital Medical Center over the past four years.

The Court also finds that as a fact that the hospital receives about 1200 applications a year for the 12 residency positions.... [I]t is not an easy matter to be received as a resident.

The Court finds that the extern program that was in place at the hospital certainly was an avenue for acceptance eventually as a resident although the Court also finds that there was no guarantee made to a person accepted as an extern that it would feel that they would be accepted into the residency program.

. . . .

After considering all the evidence and all the collateral matters and weighing the credibility of the witnesses the Court finds that there was no such national origin discriminatory policy in place....

Having so found it is not necessary for the Court to consider the next issue and that is, had there been such a policy but for that policy would the plaintiff have been accepted, selected as a person to enter the residency program.

Even if there were such a policy the Court finds that the evidence is not of such a nature that it could make that second finding, that is, that but for the policy the plaintiff would have accepted....

Having so ruled, the Court finds for the defendant with respect to the Title VII claim.

The plaintiff claims that the court should have issued findings on the issue of whether the plaintiff established a prima facie case of discrimination. Specifically, she asserts that such findings should have been made using the following analysis:

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was

850

rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted). The plaintiff claims that she established a prima facie case using this standard. Specifically, she points out that it is undisputed that she is an Indian national; that she applied for and was qualified for a residency position at St. Elizabeth; that, despite her qualifications, she was rejected; and that, after her rejection, the position remained open and the employer continued to seek applicants from persons of Dr. Kasuri's qualifications.

■ It is true that the district court did not follow this form of analysis in a rigorous fashion. However, it is equally true that the *McDonnell Douglas* standard was not "intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). It is not necessary that the district judge follow the language of the *McDonnell Douglas* analysis exactly; nor must he couch his findings in terms of a strict step-by-step analysis.

Dr. Kasuri also challenges the court's ruling on the basis that the district court did not give proper consideration to the "direct evidence" of discrimination presented by the plaintiff. She bases her discrimination claim on an alleged "one-Indian" policy. In addition to her testimony that she was told by St. Elizabeth officials that "[w]e only take one Indian in a set," the plaintiff relies upon the evidence that in fact only one Indian was hired per program year. The plaintiff contends that the court did not give proper consideration to this evidence. First of all, she points out that the court phrased the policy in terms of hiring per calendar year rather than in terms of hiring sequence. This difference in phrasing is a distinction without a difference. The court concluded that no discrimi-

natory policy was in effect at all. Whether the timing was over the calendar year or hiring sequence is immaterial to the court's findings and conclusions.

The plaintiff argues in addition that the court based its conclusion on group rights and not on individual rights. She is correct that "the obligation imposed by Title VII is to provide an equal opportunity for *each* applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the workforce." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978). However, the district court did not base its conclusion on the premise that other Indian nationals were treated fairly. Rather, the court simply was not convinced that Dr. Kasuri was the victim of discrimination. The court heard the evidence and made credibility determinations; furthermore, the court was persuaded by the collateral evidence that St. Elizabeth admits minorities and foreign nationals into its programs in numbers far above the national average. This factor weighs significantly against a finding of discrimination based upon national origin, because it indicates the willingness of the hospital to admit foreign nationals.

■ Although the plaintiff is correct that the district court did not issue its findings of fact as explicitly as it might have, the district court was not required by Fed.R.Civ.P. 52(a) to issue findings on every single issue presented at trial. As this court stated in *Grover Hill Grain Co. v. Baughman–Oster, Inc.*, 728 F.2d 784 (6th Cir.1984):

This Court has enunciated a liberal standard for reviewing the adequacy of a District Court's findings. Findings should be comprehensive and relevant to the issues so as to provide a rational basis for the trial court's decision. It is not necessary for the District Court Judge to prepare elaborate findings on every possible issue raised at trial. However, there must be findings, in such detail and exactness as the nature of the case permits, of subsidiary facts on

which an ultimate conclusion can rationally be predicated. The findings should be explicit so as to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the grounds on which the trial court reached its decision.

Findings are to be liberally construed in support of a judgment, even though the findings are not as explicit or detailed as might be desired. If, from the facts found, other facts may be inferred which will support the judgment, such inferences should be deemed to have been drawn by the District Court.

*Id.* at 792–93 (citations omitted). We conclude that the district court satisfied the requirements of Rule 52(a), and we decline to remand for a more specific statement of findings.

■ The district court in this case heard all the evidence, and it weighed the credibility of the witnesses. We may not disturb its credibility determinations on appeal unless they are clearly erroneous. *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). It also factored in certain collateral circumstances that enabled him to evaluate the history and policy of admission into the residency programs at St. Elizabeth. We conclude that the court's findings and conclusions were not clearly erroneous, and we decline to reverse the dismissal of the Title VII claim.

**B. The Dismissal of the Fraud Claim**

■ The plaintiff's second allegation of error is that the district court erred in granting a directed verdict dismissing her pendant state law fraud claim. The plaintiff is correct that the law of Ohio must be applied to determine whether the motion for a directed verdict should have been granted. *Arms v. State Farm Fire and Casualty Co.*, 731 F.2d 1245, 1248 (6th Cir.1984). In *Ruta v. Breckenridge–Remy Co.*, 69 Ohio St.2d 66, 430 N.E.2d 935 (1982), the Ohio Supreme Court set forth the standard for determining whether a motion for a directed verdict should be granted:

When a motion for a directed verdict is entered, what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to the jury. This does not involve weighing the evidence or trying the credibility of witnesses; it is in the nature of a demurrer to the evidence and assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence. The evidence is granted its most favorable interpretation and is considered as establishing every material fact it tends to prove. The "reasonable minds" test of Civ.R. 50(A)(4) calls upon the court only to determine whether there exists any evidence of substantial probative value in support of that party's claim.

69 Ohio St.2d at 68–69, 430 N.E.2d at 938. Therefore, the issue before this court is to determine whether, assuming the truth of the facts as presented by the plaintiff, the case gives rise to a cause of action for fraud under Ohio law. In Ohio, the elements of fraud are as follows:

The essential elements of a cause of action for fraud or misrepresentation [are] as follows:

"1. A false representation, actual or implied, or a concealment of a fact material to the transaction.

"2. The representation must relate to the present or past.

"3. Knowledge of the falsity of statements made with such utter disregard or recklessness as to truth or falsity that knowledge can be inferred.

"4. Intent to mislead another into relying on the representation.

"5. Reliance—with a right to reply.

"6. Injury as a result of such reliance."

*Behrend v. State of Ohio*, 55 Ohio App.2d 135, 141–42, 379 N.E.2d 617, 621 (1977) (quoting the opinion of the trial court). To establish a cause of action for fraud, the plaintiff would have to establish each of the elements listed above. Even assuming the truth of the facts as presented by the plaintiff in this case, however, the second

element listed above cannot be satisfied. The promises and representations made by the defendants with respect to Dr. Kasuri's chances of being admitted to the residency program relate to the future, not to the present or past. Therefore, as a matter of law, they do not rise to the level of fraud.

The plaintiff points out an exception to this requirement where the promisor makes a representation as to the future with no present intention of performing it. *Tibbs v. National Homes Constr. Corp.*, 52 Ohio App.2d 281, 369 N.E.2d 1218 (1977). However, there is no evidence in this case that indicates that Dr. Johnson and Dr. Wilkins did not intend to admit the plaintiff to the residency program at St. Elizabeth at the time they made their representations to Dr. Kasuri. Therefore, this exception does not apply to the case at bar.

Dr. Kasuri also attempts to ground her claim for fraud in concealment of fact. She claims that St. Elizabeth knew in the fall of 1984 that it did not intend to hire her, but that it concealed this fact from her. While it is true that fraud can be predicated on concealment of fact, concealment only gives rise to a fraud claim when the defendant has a duty to disclose the relevant fact to the plaintiff. *Burr v. Board of County Comm'rs of Stark County*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986). In this case, the hospital was under no legal duty to disclose its hiring intentions to the plaintiff.

We conclude that the district court did not err in granting the defendants' motion for a directed verdict dismissing the plaintiff's cause of action for fraud. Under any of the legal theories put forth by the plaintiff, the facts of this case, viewed in a light most favorable to her, do not give rise to an action for fraud as a matter of law.

C. The Jury Instructions on the Promissory Estoppel Claim

Another issue raised in this appeal is whether the trial court committed reversible error in its instructions to the jury on the applicable law on the issue of promissory estoppel. The district judge instructed the jury as follows:

There are four elements that you must find in deciding whether the plaintiff has established her claim of promissory estoppel. First, there must be a promise which is clear and unambiguous in its terms. Second, there needs to be reliance by the person to whom the promise is made. Third, the reliance must be both reasonable and foreseeable by the person who makes the promises. Fourth, the party asserting the estoppel must be injured by the reliance.

The plaintiff alleges that the court's instruction that the promise be "clear and unambiguous in its terms" is an incorrect statement of Ohio law. However, an Ohio court of appeals in fact has stated that an element of promissory estoppel is that the promise be "clear and unambiguous in its terms." *Cohen & Co. v. Messina*, 24 Ohio App.3d 22, 492 N.E.2d 867, 872 (1985).

The plaintiff argues that, notwithstanding *Messina* and other, unreported, decisions that state the same requirement, a reading of Supreme Court of Ohio cases is to the contrary. In particular, she places heavy reliance on *Kelly v. Georgia–Pacific Corp.*, 46 Ohio St.3d 134, 545 N.E.2d 1244 (1989), in which the supreme court recently held that the doctrine of promissory estoppel is applicable to at-will employment relationships. The court stated that the doctrine is applicable to such relationships "when a promise which the employer should reasonably expect to induce such action or forbearance on the part of the employee does induce such action or forbearance, if injustice can be avoided only by enforcement of the promise." *Kelly*, 46 Ohio St.3d at 139, 545 N.E.2d at 1250. *See also Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985). The plaintiff argues that the absence of a requirement in *Kelly* and *Mers* that the promise be clear and unambiguous demands the conclusion that the jury instruction at issue was erroneous. We disagree. While the plaintiff is correct that the Supreme Court of Ohio has not specifically adopted *Messina*, it is equally true that no supreme court case has rejected the requirement in *Messina* that the promise be

clear and unambiguous. We do not find such a requirement to be antithetical to the holding in *Kelly*. The court in *Kelly* stated that the test is "whether the employer should have reasonably expected its representation to be relied upon by its employee...." *Kelly*, 46 Ohio St.3d at 139, 545 N.E.2d at 1250. A clear and unambiguous promise is just the type of representation that a reasonable promisor would expect to induce reliance.

We also note that the special interrogatory to which the jury in this case responded did not ask the jury whether it found a clear and unambiguous promise. Instead, the interrogatory asked the jury to respond to the question whether "the defendant *promised* the plaintiff that she would be hired as a resident if she worked in a capacity as either as [sic] an extern or as a research assistant?" (emphasis added). The jury answered in the negative. Because the language of the interrogatory is not the same as the challenged instruction, it cannot be said with certainty that the jury reached its conclusion solely on the basis of a finding that there was no "clear and unambiguous" promise. Moreover, in light of the evidence before the jury, especially the vigorous denials by the hospital that any representations were made, we cannot say that, on balance, the court's instruction constituted prejudicial error.

## D. Admissibility of Dr. Hahn's Deposition

Portions of the deposition of Dr. Hahn, who served as the program director at St. Peter's, were admitted into evidence at trial over the plaintiff's objection, and she now appeals the court's decision to allow this evidence to be admitted.

Admission of the deposition in lieu of the live testimony of Dr. Hahn was proper pursuant to Fed.R.Civ.P. 32(a)(3), which permits the introduction of a deposition at trial under all circumstances in which the testimony otherwise would be admissible if the witness were testifying at trial. In this case, the parties stipulated that Dr. Hahn would be more than 100 miles from the place of trial, and the plaintiff had the opportunity to cross-examine Dr. Hahn dur-

ing the course of his deposition. Therefore, the admission of the deposition was in compliance with the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

■ Plaintiff's objection to the admission of the deposition is based upon Fed.R.Evid. 608(b), which governs the admission of character evidence to impeach the credibility of a witness:

> *(b)* Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Fed.R.Evid. 608(b). The defendant introduced the deposition to impeach the credibility of the plaintiff, who testified at her deposition that Dr. Hahn told her that she would be accepted into the residency program after he spoke to Dr. Wilkins. At trial, by contrast, Dr. Kasuri testified that Dr. Hahn was encouraging to her, but that he did not promise her a residency position. In his deposition, Dr. Hahn testified that he was encouraging to Dr. Kasuri, but that he did not guarantee her a position. The defendant impeached the plaintiff's trial testimony with the prior inconsistent statement from her deposition, and then sought to introduce the deposition of Dr. Hahn to bolster this impeachment by demonstrating that Dr. Kasuri changed her story after Dr. Hahn's deposition was taken, to make it consistent with his deposition.

According to the plaintiff, the introduction of the deposition to impeach her credibility in this manner violates Rule 608(b). She argues that the deposition constitutes extrinsic evidence of specific instances of conduct and is therefore inadmissible. In

support of this assertion, she cites *United States v. DiMatteo*, 716 F.2d 1361 (11th Cir.1983), *vacated*, 469 U.S. 1101, 105 S.Ct. 769, 83 L.Ed.2d 767 (1985). In *DiMatteo*, the Eleventh Circuit held that the testimony of a government agent as to whether marijuana was discussed at a meeting with the defendant was inadmissible under Rule 608(b). Such testimony was extrinsic evidence of a specific act of conduct of the defendant witness and therefore inadmissible. However, the plaintiff's reliance upon this case and upon Rule 608(b) is misplaced in the case at bar. The prohibition under Rule 608(b) concerns specific acts of conduct of the witness whose credibility is being attacked; that is, the rule was designed to address the situation in which the conduct of the witness in and of itself calls into question her credibility. Dr. Hahn's testimony does not constitute extrinsic evidence of specific acts of conduct of the plaintiff. While it is true that the deposition does relate to a conversation between the plaintiff and Dr. Hahn, a specific act of conduct of the plaintiff is not presented through the deposition testimony. In this instance, Dr. Kasuri's credibility is attacked by demonstrating that she changed her story to become consistent with Dr. Hahn's testimony. The deposition merely bolsters the impeachment by prior inconsistent statements. Rule 608(b) is inapposite.

We conclude that the introduction of Dr. Hahn's deposition for the purposes of attacking the credibility of the plaintiff was not improper.

We also note that the plaintiff is mistaken in her assertion that the deposition was admitted solely for the purpose of attacking credibility. The district court also admitted the deposition testimony on the substantive issue of whether Dr. Wilkins assisted or hindered the plaintiff in her efforts to be admitted into the residency program at St. Peter's. The admission of the testimony for this purpose was also proper.

**E. The Dismissal of Defendants Dr. Johnson and Dr. Wilkins**

The plaintiff's final allegation of error is that the dismissal of Dr. Johnson and Dr. Wilkins as individual defendants was improper. The district court found that the statements and actions of Dr. Johnson and Dr. Wilkins were made within the scope of their authority as employees of St. Elizabeth. As such, the hospital is bound by their statements and representations and is responsible for these representations. Because the individuals were acting in their official capacity, they are not liable as individuals for any promises or representations that they may have made, and plaintiff cites no legal authority to the contrary. We therefore conclude that the dismissal of the defendants Dr. Johnson and Dr. Wilkins was proper.

## III. THE DEFENDANTS' CROSS–APPEAL

**A. Right to Attorney's Fees Under Title VII**

The defendants cross-appeal for attorney's fees, basing their claim on 42 U.S.C. § 2000e–5(k) and on Fed.R.Civ.P. 36 and 37(c). The defendants also request an award of attorney's fees on appeal pursuant to Fed.R.App.P. 38.

■ 42 U.S.C. § 2000e–5(k) provides that attorney's fees may be awarded to the prevailing party in a Title VII action, and the standard for awarding attorney's fees to defendants in Title VII cases was set forth in *Christianburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). A district judge has discretion to award fees to a defendant only upon a finding that the plaintiff's actions in pursuing the case were frivolous, unreasonable, without foundation, or in bad faith. The defendants assert that *Christianburg* requires affirmative findings on the issue of whether the plaintiff's actions were frivolous or unreasonable and alleges that the district court erred in not conducting a hearing specifically on these issues. Section 2000e–5(k) does not require the court to conduct a hearing on the matter of attorney's fees, however. In the case before this court, the judge heard all of the evidence and had the opportunity to reach a

conclusion on whether the plaintiff's actions merited an award of attorney's fees to the defendants. A separate hearing on the issue was unnecessary.

 In support of their position that the court erred in ruling without granting a hearing, the defendants cite Rule 3.01 of the Local Rules for the Northern District of Ohio:

(1) Motions, in general, shall be submitted and determined upon the motion papers hereinafter referred to. Oral arguments of motions will be permitted on application and proper showing.

(2) The moving party shall serve and file with his motion a brief written statement of reasons in support of the motion and a list of the authorities on which he relies.

Although the defendants requested a hearing in their motion, the above rule does not provide that a hearing must always be granted upon request. Rather, the rule provides that a hearing must be granted upon proper showing. In this case, the court did not abuse its discretion by ruling on the motion without first conducting a hearing, because the defendants failed to persuade the court in their motion papers that an inquiry beyond the scope of the trial itself would be necessary.

We conclude that the district court did not abuse its discretion in declining to award attorney's fees pursuant to section 2000e–5(k), and we hold that the court did not err by issuing its order without conducting a separate hearing on the motion for fees.

## B. Right to Attorney's Fees Under Fed.R. Civ.P. 36 and 37(c)

The defendants also prayed for relief pursuant to Fed.R.Civ.P. 36 and 37(d):

Come now defendants and move this court for an order, upon hearing, directing plaintiff to pay defendants' attorney's fees and expenses as the prevailing party in accordance with the provisions of Title 42 U.S.C. § 2000e–5(k) and as a result of plaintiff's failure to admit certain matters material to the issues being tried in the request for admissions

served upon plaintiff by defendants, pursuant to Civil Rules 36 and 37(c).

Federal Rule of Civil Procedure 36 governs requests for admission, and Fed.R.Civ.P. 37(c) allows for an award of costs and reasonable attorney's fees in cases in which a party does not comply with Rule 36:

(c) Expenses on Failure to Admit. If a party fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, the requesting party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees. The court shall make the order unless it finds that (1) the request was held objectionable pursuant to Rule 36(a), or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that the party might prevail on the matter, or (4) there was other good reason for the failure to admit.

Fed.R.Civ.P. 37(c). It is the defendants' contention that the plaintiff failed to admit certain matters raised in the defendants' requests for admission, causing the defendants to prove the "genuineness ... of the truth of the matters" at trial. The district court denied the defendants' motion without a hearing, stating the following in its order:

The defendants' motion for attorney's fees and expenses is denied. The Court finds that the defendants have failed to set forth any specific basis which would establish that they are entitled to an award of attorney's fees. Accordingly, the defendants' motion is denied.

The defendants request that this court enter an order awarding fees or that this court remand the cause to the district court for a hearing on the issue.

 The plaintiff raises a number of objections to the defendants' contentions. First of all, she argues that the defendants' motion for fees pursuant to Rule 37(c) was

untimely because it was filed after this case had been appealed to this court. In support of this argument, the plaintiff cites *Popeil Bros., Inc. v. Schick Electric, Inc.*, 516 F.2d 772 (7th Cir.1975), in which the Seventh Circuit concluded that "Rule 37(c) expenses and fees must be timely sought prior to judgment and appeal...." *Id.* at 778. However, this issue was further examined by the Federal Circuit in *Chemical Engineering Corp. v. Essef Inds., Inc.*, 795 F.2d 1565 (Fed.Cir.1986), and the court concluded:

> [N]o rule specifies the time during which a Rule 37(c) motion must be filed, and, as is explained in the advisory committee note to Rule 37(c), the rule is intended to provide *post-trial* relief. As a practical matter, it will often be necessary to complete a proceeding before it can be said that a requester has "proved" the truth of the matter for which an admission had been requested.

*Id.* at 1574. There is no Sixth Circuit authority directly on point, but we are persuaded by the logic of the court in *Chemical Engineering.* Because the rule itself is silent on the issue of timing, and because the advisory committee note does indicate that Rule 37(c) was designed to provide post-trial relief, we conclude that the defendants' motion was timely filed.

The plaintiff also argues that the defendants' motion did not comply with Rule 3.01 of the Local Rules for the Northern District of Ohio. In ruling against the defendants, the district court pointed out that the defendants did not "set forth any specific basis which would establish that they are entitled to an award of attorney's fees." Although the defendants point out several instances in which the plaintiff denied certain requests for admission that the defendants later proved to be true, the defendants failed to list these specific instances in their motion. We conclude that the defendants' motion for fees under Rules 36 and 37(c) was properly denied because the defendants failed to comply with Local Rule 3.01.

### C. Request for Attorney's Fees Pursuant to Fed.R.App.P. 38

The defendants' request for attorney's fees pursuant to Fed.R.App.P. 38 is hereby denied. An award of attorney's fees is appropriate on appeal "only where there is some evidence of intentional misconduct, such as pursuit of an appeal in bad faith for purposes of harassment, delay or other such improper purposes." *Boggild v. Kenner Prods.*, 853 F.2d 465, 470 (6th Cir. 1988). There is no evidence that the plaintiff in this case has brought this appeal for any such improper purpose.

AFFIRMED.